*Katrina Hare v. David S. Brown Enterprises, Ltd.*, No. 32, September Term, 2024.

**DISCRIMINATION – STATE GOVERNMENT § 20-705(1)-(2) – SOURCE-OF-INCOME DISCRIMINATION**

In 2020, the Maryland General Assembly passed the Housing Opportunities Made Equal ("HOME") Act. *See* 2020 Md. Laws, Ch. 117. The HOME Act added "source of income" to a list of prohibited considerations in the rental or sale of housing. Md. Code Ann., State Gov't § 20-705 (2021 Repl., 2024 Supp.).

The appellee, the owner of an apartment complex, applies a minimum-income requirement to applicants for rental units. In doing so, the owner treats all income in the same manner, adding it together, regardless of source, and assessing whether the combined total exceeds 2.5 times the full gross rent for the applicable unit. The appellant is a recipient of a housing voucher who sought to rent an apartment in the owner's complex. Although the appellant's non-voucher income is more than six times the portion of rent for which she would have been responsible, the combination of her non-voucher income and the amount of her voucher subsidy falls short of 2.5 times the full gross rent for the unit. The owner rejected her application for failure to meet its minimum-income requirement. The appellant sued, contending that that requirement, as applied to her, constitutes impermissible source-of-income discrimination in violation of § 20-705. The Circuit Court for Baltimore County awarded summary judgment to the owner.

The Supreme Court of Maryland held that the fact that the owner counted voucher income in the same manner as other sources of income for purposes of meeting its minimum-income requirement did not entitle the owner to summary judgment because it does not resolve the appellant's disparate impact claim. In a disparate impact claim, a plaintiff asserts that a facially neutral policy has a disparate impact on a protected individual or group that is not justified by a legitimate, nondiscriminatory reason.

Circuit Court for Baltimore County
Case No. C-03-CV-22-004201
Argued: May 5, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 32

September Term, 2024

_____

KATRINA HARE

v.

DAVID S. BROWN ENTERPRISES, LTD.

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Fader, C.J.
Watts and Gould, JJ., concur.

_____

Filed: July 28, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In 2020, the Maryland General Assembly passed the Housing Opportunities Made Equal ("HOME") Act.  *See* 2020 Md. Laws, Ch. 117.  The HOME Act added "source of income" to a list of prohibited considerations in the rental or sale of housing,[1] making it unlawful, subject to certain exceptions, to:

> (1) refuse to sell or rent after the making of a bona fide offer, refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . source of income; [or]
>
> (2) discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling . . . because of . . . source of income[.]

*Id.*, *codified at* Md. Code Ann., State Gov't § 20-705(1)-(2) (2021 Repl., 2024 Supp.).  The primary purpose of the HOME Act was to prevent discrimination against people who use vouchers to pay for some or all of the cost of their housing.

At issue here is whether the appellee, David S. Brown Enterprises, Ltd. ("DSB"), violated § 20-705 by refusing to rent an apartment to the appellant, Katrina Hare.  Ms. Hare is a voucher recipient.  She sought to rent an apartment from DSB with a monthly rent of $1,590.  Ms. Hare had a housing voucher that would have covered $1,464 of that amount, leaving her responsible for just $126 a month.  However, when reviewing Ms. Hare's rental application, DSB applied a minimum-income requirement by which it required renters to demonstrate monthly income that is at least 2.5 times the monthly rental payment.  Ms. Hare's only source of income outside of her voucher was supplemental security income of $841 per month.  DSB added the amount of Ms. Hare's voucher subsidy to her

---

[1] Other prohibited considerations include "race, color, religion, sex, disability, marital status, familial status, sexual orientation, gender identity, national origin," and "military status[.]"  State Gov't § 20-705(1)-(2).

supplemental security income, determined that the total ($2,305) failed to meet the minimum-income threshold ($3,975), and denied her application.

Ms. Hare contends that DSB's application of its minimum-income requirement discriminates against holders of housing vouchers by requiring them to demonstrate monthly income that is 2.5 times the total monthly rent, rather than 2.5 times the portion of rent for which they are responsible (i.e., the amount not covered by the voucher). Here, Ms. Hare's supplemental security income was more than six times her share of rent. She contends that DSB's application of its minimum-income requirement constitutes disparate treatment discrimination against voucher holders, and that it also has an impermissible disparate impact on voucher holders as compared with non-voucher holders.

DSB responds that its minimum-income requirement does not discriminate because it treats all sources of income, including housing vouchers, the same way by adding together all income from all sources to determine if the total meets the 2.5 times total monthly rent threshold. DSB also argues that Ms. Hare cannot show that its policy results in a disparate impact on voucher holders.

We agree with the Circuit Court for Baltimore County that DSB was entitled to summary judgment to the extent that Ms. Hare's source-of-income discrimination claim was premised on disparate treatment. However, Ms. Hare's discrimination claim is also premised on a disparate impact theory of liability. Applying that theory, the issue is not whether DSB treated Ms. Hare differently when it counted her voucher subsidy in the same manner as all other types of income. Instead, the issue is whether DSB's minimum-income requirement, though facially neutral, falls more harshly on voucher holders than a

2

differently situated and appropriately comparable group, and, if so, whether DSB can identify a legitimate business need for that practice. We will therefore vacate the judgment of the circuit court and remand for further proceedings consistent with this opinion.

## BACKGROUND

Section 20-702(a) of the State Government Article declares:

It is the policy of the State:

> (1) to provide for fair housing throughout the State to all, regardless of race, color, religion, sex, familial status, national origin, marital status, sexual orientation, gender identity, disability, source of income, or military status; and
>
> (2) to that end, to prohibit discriminatory practices with respect to residential housing by any person, in order to protect and ensure the peace, health, safety, prosperity, and general welfare of all.

In expressly drawing a connection between prohibiting discriminatory housing practices and ensuring "the peace, health, safety, prosperity, and general welfare of all," the General Assembly recognized the importance of stable housing, regardless of status, as a foundation for achieving health and prosperity. Without stable housing, it is "increasingly difficult for low-income families to enjoy a kind of psychological stability, which allows people to place an emotional investment in their home, social relationships, and community; school stability, which increases the chances that children will excel in their studies and graduate; or community stability, which increases the chances for neighbors to form strong bonds and to invest in their neighborhoods." Matthew Desmond & Rachel Tolbert Kimbro, *Eviction's Fallout: Housing, Hardship, and Health*, 94 Soc. Forces 295, 296 (2015) (citation omitted). An absence of stable housing can also lead to

3

involvement in the criminal justice system and consequent criminal records that make future employment difficult. *See* Maria Foscarinis, *Downward Spiral: Homelessness and Its Criminalization*, 14 Yale L. & Pol'y Rev. 1, 1-2 (1996). Indeed, housing instability can lead to a "vicious and multifarious" spiral of evictions, criminal activity, and credit defaults, all of which can make it difficult to ever regain stability. *See* Vicki Been & Leila Bozorg, *Spiraling: Evictions and Other Causes and Consequences of Housing Instability*, 130 Harv. L. Rev. 1408, 1410-12 (2017) (reviewing Matthew Desmond, Evicted: Poverty and Profit in the American City (2016)).

Housing instability has also long been linked with forms of historical and pervasive discrimination, including that based on race, religion, and ethnicity. Karl Taeuber, *The Contemporary Context of Housing Discrimination*, 6 Yale L. & Pol'y Rev. 339, 339 (1988) (noting that the "racial structure of housing in the United States is rooted in history"). *See generally id.* (discussing the history of housing discrimination against Black Americans); Samantha Ondrade, *Enforcement of the Fair Housing Act and Equal Credit Opportunity Act to Combat Redlining*, 70 Dep't of Just. J. Fed. L. & Prac. 247 (2022) (the same); A. Mechele Dickerson, *Systemic Racism and Housing*, 70 Emory L.J. 1535 (2021) (discussing systemic racism in housing against minority home buyers); Mary Ellen Stratthaus, *Flaw in the Jewel: Housing Discrimination Against Jews in La Jolla, California*, 84 Am. Jewish His. 189 (1996) (providing an example of housing discrimination against Jews).

### A.    Vouchers

In 1937, Congress enacted the United States Housing Act, which established the Housing Choice Voucher Program. Formerly known as the Section 8 voucher program,

this program is administered through local public housing agencies. 24 C.F.R. § 982.1(a). As described in a guide published by the local public housing agency relevant here, the Baltimore County Department of Housing and Community Development (the "Local Department"), the program "helps low and moderate income families rent housing in the private market by paying a portion of the families' rent each month."[2]

Eligibility for vouchers depends primarily on a household's annual income compared to the area median income, family size, and citizenship status. *See* 24 C.F.R. § 982.201. At least 75% of housing choice vouchers must go to "extremely low-income" households, which generally means households at or below the higher of the federal poverty line or 30% of area median income. 42 U.S.C. § 1437n(b)(1); 24 C.F.R. § 5.603(b). Remaining vouchers may be awarded to households that are "very low income" or "low income," which generally means at or below 50% or 80% of the area median income, respectively. 24 C.F.R. § 5.603(b).[3] Approximately 54,000 households in Maryland used a housing choice voucher in 2024; about 78% of them were "extremely low-income."[4]

---

[2] *Program Participant Reference Guide*, Baltimore County Off. of Hous.: Hous. Choice Voucher Program 12 (Mar. 14, 2018), https://www.baltimorecountymd.gov/files/Documents/housing/housingparticipantguide.pdf [https://perma.cc/8TJ5-VY5S]. The guide also explains that "[t]he supply of rent vouchers is very limited, and the County maintains a waiting list of eligible, interested families." *Id*.

[3] *Housing Choice Voucher Program Guidebook: Eligibility Determination and Denial of Assistance*, U.S. Dep't of Hous. & Urb. Dev. 6 (Nov. 2019), https://www.hud.gov/sites/dfiles/PIH/documents/HCV_Guidebook_Eligibility_Determination_and_Denial_of_Assistance.pdf [https://perma.cc/DXV9-FS86].

[4] *Assisted Housing: National and Local*, U.S. Dep't of Hous. & Urb. Dev., Off. of Pol'y Dev. & Rsch., https://www.huduser.gov/portal/datasets/assthsg.html (last visited

The purpose of the housing choice voucher program is to "help[] low-income families, elderly persons, veterans and disabled individuals afford housing in the private market."[5]  To ensure that the units for which it provides vouchers are affordable, the program helps families pay rent for units they might otherwise not be able to afford while also ensuring that ample funds remain to cover other living expenses.  To do so, the program establishes the recipient's contribution to rent at an amount the recipient is considered able to pay—generally set at 30% of their monthly adjusted income and never more than 40% of such income—and provides a subsidy to make up the rest.[6]  The 30%

Apr. 24, 2025).  This data can be accessed at the cited link by selecting "2024 Based on 2020 Census," "State," "Maryland," "Housing Choice Vouchers," and "All" variables.

[5] *HCV Applicant and Tenant Resources*, U.S. Dep't of Hous. & Urb. Dev., https://www.hud.gov/helping-americans/housing-choice-vouchers-tenants [https://perma.cc/H2SC-4EJU] (last visited June 20, 2025).

[6] *See Housing Choice Voucher Program Guidebook: Calculating Rent and Housing Assistance Payments (HAP)*, U.S. Dep't of Hous. & Urb. Dev. 2-6 (Nov. 2019), https://www.hud.gov/sites/dfiles/PIH/documents/HCV_Guidebook_Calculating_Rent_an d_HAP_Payments.pdf [https://perma.cc/VW45-UNUA] (explaining that the calculation of the tenant's portion of rent is generally based on a tenant's monthly income and further explaining that a local public housing agency may not approve a unit for which the recipient's gross share would exceed 40% of monthly adjusted income, a limitation that is "essential" for the selection of an "appropriately priced home").

In determining the amount of the voucher subsidy for which a recipient qualifies, the local public housing agency first identifies a "total tenant payment" or "family share" of rent, which is generally pegged at 30% of the recipient's monthly adjusted income.  *See* 24 C.F.R. § 5.628(a) (stating that the total tenant payment is the higher of 30% of monthly adjusted income, 10% of monthly income, the amount of welfare assistance payments specifically designated for housing costs, or a minimum amount of rent set by the local public housing agency).

6

limitation implements the federal standard for determining when housing is affordable.[7] The subsidy the local public housing agency will pay for a housing unit priced at or below the agency's "payment standard"[8] is the difference between the recipient's payment and the gross rent charged for the unit.  24 C.F.R. §§ 982.4(b), 982.505(b), 982.508.  If the gross rent exceeds the payment standard, the recipient is generally responsible for paying the excess.  *See id.* §§ 982.508, 982.515; *see also Program Participant Reference Guide*, above at note 2, at 38.  There are exceptions, however, one of which was applied in this case.  Due to her disability, Ms. Hare received an accommodation pursuant to which the local public housing agency approved a unit that exceeded the payment standard, although apparently only slightly.  Accordingly, the agency would have paid an even greater share of Ms. Hare's rent—in this case, more than 90 percent.

---

[7] *See CHAS: Background*, U.S. Dep't of Hous. & Urb. Dev., Off. of Pol'y Dev. & Rsch.,      https://www.huduser.gov/portal/datasets/cp/CHAS/bg_chas.html [https://perma.cc/9PJR-GDRE] (last visited June 20, 2025) (defining "cost burden" as monthly housing costs that exceed 30% of monthly income); *see also* Joint Ctr. for Hous. Stud. of Harv. Univ., *The State of the Nation's Housing 2018*, at 28 (2018), https://www.jchs.harvard.edu/sites/default/files/Harvard_JCHS_State_of_the_Nations_Housing_2018.pdf [https://perma.cc/BJ8L-RFVW].

[8] The "payment standard" is an amount that is set by each local public housing agency for each unit size in the area.  24 C.F.R. § 982.503.  The payment standard is established initially based on a determination of "fair market rent" for the unit at issue in the applicable jurisdiction.  *Id.*  "Fair market rent" is a calculation of rent plus the cost of non-telephone utilities that is set for each rental market in the country at the 40th percentile rent for standard quality housing units in that area, meaning that 40% of rents for such units will fall below the "fair market rent."  *See id.* § 888.113.  Local public housing agencies may establish payment standards "between 90 percent and 110 percent of" the "fair market rent" for a unit size.  *Id.* § 982.503(b)(1)(i).  So, the payment standard is set at a value that is between 90 percent and 110 percent of the 40th percentile rent in the area.

Subsidies are generally paid directly to the owner of the housing unit, never touching the hands of the tenant. 24 C.F.R. § 982.4(b) (defining "[h]ousing assistance payment" as the "monthly assistance payment by" a public housing authority "to the owner for rent . . . under the family's lease"). The local housing agency makes payments to tenants only when the amount of the subsidy exceeds the amount due to the owner of the unit. *Id.* In that case, the excess is paid to the tenant as a "[u]tility reimbursement." *Id.*

In summary, voucher subsidies are purposely calculated to make quality housing units available and affordable to low-income, eligible tenants. Local public housing agencies seek to accomplish that by establishing a tenant payment obligation at an amount the tenant can afford, *see Program Participant Reference Guide*, above at note 2, at 36, and then paying the remainder of gross rent due directly to the owner of the unit.

### B.      *Source-of-Income Discrimination in Housing and the HOME Act*

Recipients of housing choice vouchers are, by definition, low-income, with at least three-quarters of them having incomes 30% of or less than the area median income. *See* 42 U.S.C. § 1437n(b)(1); 24 C.F.R. § 5.603(b). Recipients are also disproportionately minorities,[9] who are therefore disproportionately affected when owners of housing units who are not required to accept vouchers choose not to do so. *See* Robert G. Schwemm, *Source-of-Income Discrimination and the Fair Housing Act*, 70 Case W. Rsrv. L. Rev. 573,

---

[9] *See Assisted Housing: National and Local*, above at note 4 (providing that 84% of housing choice voucher holders in Maryland are "Minority" with 79% of holders being "Black Non-Hispanic").

648 (2020) (describing how source-of-income discrimination disproportionately harms racial minorities and other Fair Housing Act-protected groups).

In response to some owners declining to rent to voucher holders, some states have enacted laws barring discrimination based on the source of a prospective tenant's income.[10] *See* Schwemm, above, app'x I at 650-53. In 2020, Maryland joined them by passing the HOME Act. *See* 2020 Md. Laws, Ch. 117. That Act amended § 20-705 of the State Government Article, which prohibits discriminatory practices in the sale or rental of a dwelling on several enumerated grounds, by adding "source of income" as an additional basis on which discrimination is prohibited. As amended, the provision now states in relevant part that, except as otherwise provided,

> a person may not:
>
> (1) refuse to sell or rent after the making of a bona fide offer, refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, disability, marital status, familial status, sexual orientation, gender identity, national origin, source of income, or military status; [or]
>
> (2) discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with the sale or rental of a dwelling, because of race, color, religion, sex, disability, marital status, familial status, sexual orientation, gender identity, national origin, source of income, or military status;
>
> . . .

---

[10] *See* Cal. Gov't Code § 12955; Conn. Gen. Stat. Ann. § 46a-64c; Del. Code Ann. tit. 6, § 4603(b); Me. Rev. Stat. Ann. tit. 5, § 4581-A; Mass. Gen. Laws ch. 151B, § 4.10; Minn. Stat. Ann. § 363A.09 subd. 1; N.J. Stat. Ann. §§ 10:5-4, 10:5-12g; N.Y. Exec. Law § 296.2-a(a)-(e); N.D. Cent. Code Ann. § 14-02.5-02(1)-(2); Okla. Stat. Ann. tit. 25, § 1452.A.8; Or. Stat. Ann. §659A.421(2)-(6); Utah Code Ann. § 57-21-5; Va. Code Ann. § 36-96.1; Vt. Stat. Ann. tit. 9, § 4503(a); Wash. Rev. Code § 59.18.255; Wis. Stat. Ann. § 106.50(1).

State Gov't § 20-705(1)-(2).

For purposes of this prohibition, "[s]ource of income" means "any lawful source of money paid directly or indirectly to or on behalf of a renter or buyer of housing[,]" including:

(i) a lawful profession, occupation, or job;

(ii) any government or private assistance, grant, loan, or rental assistance program, including low-income housing assistance certificates and vouchers issued under the United States Housing Act of 1937;

(iii) a gift, an inheritance, a pension, an annuity, alimony, child support, or any other consideration or benefit; or

(iv) the sale or pledge of property or an interest in property.

*Id.* § 20-701(j).

The Act specifies that the prohibition against source-of-income discrimination does not "prohibit a person from determining the ability of a potential buyer or renter to pay a purchase price or pay rent by verifying in a commercially reasonable and nondiscriminatory manner the source and amount of income or creditworthiness of the potential buyer or renter[.]" *Id.* § 20-704(d)(1).

The legislative history of the HOME Act makes plain that the Act was directed primarily to prevent discrimination against voucher holders. The sponsor of the legislation, then-Delegate (now-Comptroller) Brooke Lierman, identified the problem to which it was addressed, testifying that voucher holders "go from place to place to place, and people, landlords, will not accept them." *Hearing on H.B. 231 Before the Env't & Transp. Comm.*, 441st Sess. Md. Gen. Assembly, at 1:29:03-18 (Feb. 4, 2020), https://tinyurl.com/bddc3vmb [https://perma.cc/VL5W-JFCV]. She noted that "if you are

10

a voucher holder in a county in Maryland that does not protect against source-of-income discrimination,[11] your rate of being able to use that voucher . . . could be as low as 50%," and she compared that to the "99%" acceptance of vouchers in counties that prohibit source-of-income discrimination. *Id.* at 1:29:25-52. The testimony of other witnesses also focused on the role of vouchers in housing selection.[12]

The Revised Fiscal and Policy Note associated with the HOME Act also confirms that it was targeted at discrimination against voucher holders. *See* Revised Fiscal & Policy Note, above at note 11, at 5-8. The Note includes an appendix containing background on other source-of-income discrimination laws, a general summary of the Housing Choice Voucher Program, and a summary of issues related to source-of-income discrimination in the context of vouchers. *Id.* With respect to the latter, the Note includes a discussion of the lack of progress made in the absence of such protections toward the goal of "allow[ing] [housing choice voucher] program recipients to choose where they live, in an effort to avoid

---

[11] According to the Fiscal and Policy Note for the legislation, six counties and three cities in Maryland prohibited source-of-income discrimination in their jurisdictions before passage of the HOME Act. H.B. 231 Revised Fiscal & Policy Note, app'x at 5 (2020), https://mgaleg.maryland.gov/2020RS/fnotes/bil_0001/hb0231.pdf [https://perma.cc/7ZER-BL8Q].

[12] *See generally, e.g.*, *Hearing on S.B. 530 Before the Senate Judicial Proceedings Comm.*, 441st Sess. Md. Gen. Assembly (Feb. 4, 2020) (written testimony of Michele Gilman, Venable Professor of Law and Director of Civil Advocacy Clinic at the University of Baltimore School of Law) (explaining how the HOME Act and Housing Choice Vouchers would address problems with affordable housing in Maryland), https://mgaleg.maryland.gov/cmte_testimony/2020/jpr/2365_02042020_111946-840.pdf [https://perma.cc/VA4B-V32R].

duplicating the pockets of poverty that were created with public housing developments." *Id.* at 7.

In sum, the addition of "source of income" to § 20-705 was intended primarily to preclude discrimination against persons using vouchers to obtain affordable housing.

### C.    DSB and Ms. Hare

Ms. Hare is a recipient of a housing choice voucher. She qualifies for the voucher on account of her disability and its impact on her ability to work and earn income. Her disability also makes her eligible for a greater subsidy than would otherwise be available as an accommodation. *See Program Participant Reference Guide*, above at note 2, at 37. Outside of her voucher, Ms. Hare's sole monthly income consists of $841 in supplemental security income.

In February 2022, Ms. Hare applied to rent an apartment in a complex owned by DSB. The unit's rental cost at the time was $1,590 per month. As part of the application process, DSB required most applicants to demonstrate income of "2.5 times the monthly market rent."[13] For the unit selected by Ms. Hare, that policy required her to demonstrate monthly income of $3,975.

---

[13] A document describing DSB's application processing policy describes "various categories of applicants that could qualify" to rent an apartment under its policy, including employed or self-employed individuals with sufficient documented income, minors or other dependents reliant on the support of another occupant with sufficient documented income, and individuals for whom a guarantor could show a minimum income of five times the monthly rent. In addition, the document identifies two categories of applicants for whom no showing of "reliable, regular, documentable income" is apparently required: (1) applicants who can show sufficient "assets to comfortably pay the rent"; and (2) full-time students, who could qualify either with the support of a guarantor or "with an I-20

12

At first, apparently because the apartment's monthly rent slightly exceeded the applicable payment standard, the Local Department asked DSB to reduce the rent to $1,572. After DSB declined, the Local Department responded that it had "approved an exception to the payment standard to move forward at the full rental rate of $1590."[14] The Local Department then approved Ms. Hare for a voucher with a housing assistance payment (i.e., subsidy) of $1,464 and a total tenant payment of $126. The voucher would thus have covered approximately 92% of the total monthly rent.

After receiving that information, DSB had Ms. Hare submit information about her income to a third party that evaluated whether she met the minimum-income requirement. The third party combined Ms. Hare's supplemental security income of $841 with the $1,464 voucher subsidy for which she was approved and determined that the total of $2,305 fell well short of the required $3,975. Accordingly, DSB rejected Ms. Hare's application.

---

Form or other official government documentation indicating that, through some form of financial aid, the applicant's living expenses will be provided." And at oral argument, DSB suggested that, in situations where two roommates have two separate sources of income, the "income can be pooled between them to meet the requirement." In that case, neither roommate would need to demonstrate income of 2.5 times the total rent. It is not clear whether each would be responsible for demonstrating income of 2.5 times their share of rent, or if the income is simply pooled without respect to share of rent.

[14] In its initial correspondence, the Local Department stated that the rental rate of $1,590 "is not going to be affordable to the tenant." Although unstated, it seems likely that that statement was simply a reference to that rental rate exceeding the applicable payment standard, albeit apparently not by much by virtue of the Local Department's request to reduce the rent only to $1,572. In its official guide, the Local Department explains that "[i]f the contract rent and utilities are less than the payment standard established by the [Department], the unit is affordable." *Program Participant Reference Guide*, above at note 2, at 36.

In June 2022, Ms. Hare filed a complaint with the Maryland Commission on Civil Rights. After the Commission found no probable cause to support her claim, Ms. Hare filed suit against DSB in the Circuit Court for Baltimore County. Ms. Hare alleged, among other things, that DSB's policy violated the prohibition on source-of-income discrimination in § 20-705 of the State Government Article.[15]

Following discovery, DSB moved for summary judgment and argued that it rejected Ms. Hare because of her lack of sufficient income, not the source of that income. DSB's motion addressed Ms. Hare's discrimination claim using a disparate treatment framework. In response, Ms. Hare argued that DSB engaged in source-of-income discrimination, and that "the proper methodology that should have been used by DSB would have been to subtract the voucher amount from the rent" and then compare her non-voucher income to the portion of rent for which she was responsible ($126). Applying that methodology, Ms. Hare had monthly income of more than six times the rent for which she was responsible.

The circuit court granted DSB's motion. The court determined that "[t]he Home Act's plain meaning limits its application to the source, or origin, of income but in no way prohibits consideration of amount." Because DSB "neutrally applied its income qualification criteria to" Ms. Hare, and rejected her application based on the amount, rather

---

[15] Ms. Hare also brought two other claims related to alleged disability discrimination and failure to make reasonable accommodations. Those claims are not at issue here.

14

than source of her income, the court ruled that DSB was entitled to judgment as a matter of law.

Ms. Hare appealed. While that appeal was pending, Ms. Hare filed a bypass petition for a writ of certiorari. Although neither party had addressed disparate impact in their summary judgment filings before the circuit court,[16] in her petition, Ms. Hare couched her argument in terms that could be reasonably interpreted as asserting disparate impact, asking this Court to grant certiorari to address the following question:

> Where a tenant's rent is subsidized by a housing voucher, does a landlord's imposition of an income requirement that ignores the share of the rent guaranteed by the voucher and has the effect of excluding voucher holders constitute source-of-income discrimination in violation of Md. Code Ann., State Gov't § 20-705?

DSB did not file an answer to the petition. We granted the petition to resolve the question presented by Ms. Hare. *Hare v. David S. Brown Enters., Ltd.*, 489 Md. 243 (2024).

In her opening brief in this Court, Ms. Hare argued both disparate treatment and disparate impact discrimination theories of liability. In its brief, DSB responded on the merits to both theories, failing to argue preservation. It was not until oral argument that

---

[16] In her complaint, although she did not use the phrase "disparate impact," Ms. Hare pled allegations that can reasonably be interpreted as invoking disparate impact as a basis for liability. In paragraph 48, she alleged that the minimum-income requirement "disproportionately impacts and discriminates against individuals who are disabled and have income made up of [housing choice vouchers] and [supplemental security income]." She made similar allegations in paragraphs 51 (alleging that DSB's requirement "virtually eliminates the possibility for a [housing choice voucher] recipient to ever be able to rent at the apartments"), 52 ("Such a policy would have a discriminatory impact on individuals whose source of income is made up of [housing choice vouchers.]"), and 57 ("As the alleged policy, currently stated and enforced, would essentially preclude a[ housing choice voucher] recipient from being able to rent a dwelling at the . . . apartment complex.").

15

DSB pointed out that Ms. Hare had not asserted a disparate impact discrimination theory of liability in her summary judgment filings before the circuit court. Even then, however, DSB acknowledged that it had not briefed preservation and was not raising a preservation issue. Any reliance on preservation has been waived. *See Rosales v. State*, 463 Md. 552, 569-70 (2019) ("[A] question not presented or argued in [a party's] brief is waived or abandoned and is, therefore, not properly preserved for review." (first alteration in original) (quoting *Hobby v. State*, 436 Md. 526, 542 (2014))).

## DISCUSSION

Courts assess discrimination claims through two primary lenses: disparate treatment and disparate impact. Put simply, disparate treatment occurs when two similarly situated groups or individuals are treated differently based on belonging to a protected category or class. *See, e.g.*, *Pavan v. Smith*, 582 U.S. 563, 566 (2017) (noting that laws that "exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples" is a form of disparate treatment (quoting *Obergefell v. Hodges*, 576 U.S. 644, 675-76 (2015))); *Nordlinger v. Hahn*, 505 U.S. 1, 30 (1992) (Stevens, J., dissenting) (writing that it is disparate treatment when "[t]wo families with equal needs and equal resources are treated differently solely because of their different heritage"); *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003) ("To successfully allege disparate treatment, a plaintiff must show 'that others similarly situated to him in all relevant respects were treated differently by the employer.'" (quoting *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999))).

16

Disparate impact occurs when parties are facially treated the same, but the outcome is discriminatory, often because the two groups are differently situated in a meaningful way. *See, e.g.*, *Tex. Dep't of Hous. & Community Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 531 (2015) (describing disparate impact liability as proscribing "practices that are fair in form, but discriminatory in operation" (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971))); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (stating that disparate impact claims "involve . . . practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another" (quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977))); *Smith v. City of Jackson*, 544 U.S. 228, 239 (2005) (applying disparate impact analysis to claims under the Age Discrimination in Employment Act). That is, if you assign a test of flight to a bird and a fish, you will have treated them the same, but the impact of the facially equal treatment discriminates against the fish.

Ms. Hare makes both claims. She argues that the minimum-income requirement results in disparate treatment because non-voucher holders are required to demonstrate income of just 2.5 times what they are obligated to pay in rent, while she is required to demonstrate income of $3,975, which is more than 31 times the $126 she is obligated to pay in rent. She also argues that even if the minimum-income requirement does not constitute disparate treatment, it results in a disparate impact because it precludes a large percentage of voucher holders from qualifying to rent from DSB—including the more than 75% of voucher holders designated as extremely low income—while excluding a far lower percentage of non-voucher holders.

17

DSB responds that it was entitled to judgment as a matter of law on both theories. It argues that it does not engage in disparate treatment because it treats all sources of income identically, as the circuit court found. And it suggests that Ms. Hare cannot demonstrate a disparate impact both because eight voucher holders live in the relevant apartment complex, showing that its policy does not exclude all voucher holders, and because Ms. Hare cannot show any disparate impact as between herself and non-voucher holders who are similarly unable to meet its minimum-income requirement.[17]

## I.    STANDARD OF REVIEW

At issue is the circuit court's ruling on DSB's motion for summary judgment. This Court "reviews a circuit court's grant of summary judgment without deference." *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 637 (2024). In doing so, we take "an independent review of the record to determine whether a genuine dispute of material fact exists and whether the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 694 (2015)); *see also* Md. Rule 2-501(a).

## II.    DISPARATE TREATMENT

Disparate treatment claims arise when a party has purposely "'treated [a] particular person less favorably than others because of' a protected trait." *See Ricci v. DeStefano*,

---

[17] DSB further argues that the apartment complex at issue is a "luxury" complex for which it should not be surprising that the monthly rent exceeds what is available to a standard voucher holder. As discussed above in note 14, it appears that the rent for the unit Ms. Hare desired was only slightly above the Local Department's applicable payment standard.

557 U.S. 557, 577 (2009) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 985-86 (1988)); *see also Kosereis*, 331 F.3d at 214 ("To successfully allege disparate treatment, a plaintiff must show 'that others similarly situated to him in all relevant respects were treated differently by the employer.'" (quoting *Conward*, 171 F.3d at 20)). When there is an appropriate federal analog, as is the case here, we assess disparate treatment claims involving circumstantial evidence of a discriminatory motive under the three-step framework adopted by the United States Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Town of Riverdale Park v. Ashkar*, 474 Md. 581, 615-16 (2021); *Belfiore v. Merchant Link, LLC*, 236 Md. App. 32, 45 (2018).

In the first step, the plaintiff must make out a prima facie case of discrimination, *Molesworth v. Brandon*, 341 Md. 621, 638 (1996), by showing (1) membership in a protected class, (2) different treatment than other prospective tenants because of membership in that class, and (3) evidence to support an inference of discriminatory motive, *see Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540, 1545 (2025); *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229-30 (2015). The "burden of production for a prima facie case of discrimination is minimal," *Ashkar*, 474 Md. at 616 (italics omitted), and the "elements of the prima facie case depend upon the facts of the case," *Molesworth*, 341 Md. at 638.

If the plaintiff clears that bar, in the second step, the burden shifts to the defendant to show a legitimate nondiscriminatory reason for its policy or actions. *Id.* If such a reason is given, in the third step, the burden shifts back to the plaintiff to show that the reason is pretextual. *Id.* at 638-39.

We agree with the circuit court that DSB was entitled to summary judgment as a matter of law on Ms. Hare's disparate treatment theory of liability. Ms. Hare argues that she is similarly situated to non-voucher holders, but that she is treated differently by being made to demonstrate income at a level that is far higher than 2.5 times her portion of rent. But that argument depends on redefining the measuring sticks applied by DSB: (1) from the total market rent for the unit to just the particular tenant's portion; and (2) from total income from all sources to income remaining after applying the voucher.[18] But DSB's measuring sticks are facially neutral, and the disparate treatment framework does not allow us to redefine them to match Ms. Hare's theory. Viewed under the lens of discriminatory treatment, we agree with the circuit court that the claim fails. Ms. Hare, like all other applicants, was required to demonstrate income of 2.5 times the total rent due for the unit she sought to lease, with all sources of income aggregated in the same way for purposes of that calculation. The problem, as we will turn to next, is that voucher income is different in meaningful ways from other types of income, and treating it identically may result in disparate impact discrimination against voucher holders.

## III.    DISPARATE IMPACT

The United States Supreme Court first analyzed disparate impact in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). A decade ago, in *Texas Department of Housing &*

---

[18] Before this Court, Ms. Hare has stepped back from the contention that DSB was required to apply its minimum-income requirement in this way. She now argues that this method of calculation is a non-discriminatory way to achieve DSB's objective of discerning ability to pay, but she acknowledges that it is not required and that DSB can select a different method if it is not discriminatory.

*Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), the Court expressly recognized that the disparate impact theory of liability is applicable to anti-discrimination provisions in the federal analog to Maryland's State Gov't § 20-705. Disparate impact discrimination pertains to "practices that are fair in form[] but discriminatory in operation." *Griggs*, 401 U.S. at 431. The disparate impact theory of liability recognizes that at times, treating things that are different in meaningful ways as though they are the same can perpetuate discrimination. *See* Justin D. Cummins, *Refashioning the Disparate Treatment and Disparate Impact Doctrines in Theory and in Practice*, 41 Howard L.J. 455, 461 n.32 (1998).

In *Griggs*, the United States Supreme Court found that certain job qualifications imposed by an employer were discriminatory in impact, although applied in a facially neutral way, because they disqualified Black applicants at a "substantially higher rate than white applicants," and had no identifiable relationship to the jobs for which they were imposed. *Griggs*, 401 U.S. at 426, 432, 436. *See generally* David J. Garrow, *Toward a Definitive History of* Griggs v. Duke Power Co., 67 Vand. L. Rev. 197, 200-07 (2014) (providing additional context to *Griggs*). In adopting the disparate impact theory, the Court observed that the objective of Title VII of the Civil Rights Act of 1964 was "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Griggs*, 401 U.S. at 429-30. Thus, "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Id.* at 430. The Court also rejected the employer's

contention that its aptitude tests were expressly approved by Title VII, which authorized "'any professionally developed ability test' that is not 'designed, intended *or used* to discriminate because of race.'" *Id.* at 433 (emphasis in *Griggs*) (quoting § 703(h) of the Civil Rights Act of 1964). In doing so, the Court agreed with the Equal Employment Opportunity Commission that the exception was intended to apply only to job-related tests. *Id.* at 433-34, 436 ("What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract.").

In *Inclusive Communities*, the Supreme Court recognized, as most intermediate federal appellate courts already had, that the disparate impact theory applies to discrimination claims under the federal Fair Housing Act ("FHA"), 42 U.S.C. § 3604. *Inclusive Communities*, 576 U.S. at 543. The Court described the disparate impact theory of liability as a challenge to practices "that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Id.* at 524-25 (quoting *Ricci*, 557 U.S. at 577). In determining whether that theory applies to FHA claims, the Court looked to the language of two provisions of that statute that prohibit discrimination in housing. The first, employing language identical in all relevant operational respects to § 20-705(1), made it unlawful to, among other things, "otherwise make unavailable or deny[] a dwelling to any person because of race[.]" *Id.* at 533. The Court found that the phrase "otherwise make unavailable or deny" "refers to the consequences of an action rather than the actor's intent," and that such "results-oriented language counsels in favor of recognizing disparate-impact liability." *Id.* at 534. The second provision, employing language identical in all relevant operational respects to § 20-705(2), broadly prohibits

22

"discrimination," which is similar to language the Court had previously interpreted "to include disparate-impact liability." *Id.* (citing *Board of Education of City School District of New York v. Harris*, 444 U.S. 130, 140-41 (1979), as having held that the term "'discriminat[e]' encompassed disparate-impact liability in the context of a statute's text, history, purpose, and structure").

Turning from the statutory language, the Court found it significant that Congress had amended the FHA after nine federal appellate circuits had unanimously held that the FHA supports disparate impact claims, suggesting that Congress approved of that interpretation. *Inclusive Communities*, 576 U.S. at 535-36. And, significantly, the Court found "[r]ecognition of disparate-impact claims is consistent with the FHA's central purpose," which, "like Title VII and the [Age Discrimination in Employment Act, is] to eradicate discriminatory practices within a sector of our Nation's economy." *Id.* at 539. The Court stressed, however, that disparate impact analysis is subject to several limitations, including that it precludes only "artificial, arbitrary, and unnecessary barriers," *id.* at 540 (quoting *Griggs*, 401 U.S. at 431), not policies that are "necessary to achieve a valid interest," even if they result in a disparate impact on a protected group, *id.* at 540-41. The Act, the Court held, aims to ensure that legitimate "priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation." *Id.* at 540. Thus, it is critical that disparate impact analysis be applied in such a way as to give defendants the opportunity "to state and explain the valid interest served by their policies." *Id.* at 541.

The Court proceeded to follow a three-part framework the Department of Housing and Urban Development had applied, and which the Court seemed to implicitly adopt, at

23

least in its broad contours, for disparate impact claims. The first step of the framework requires the plaintiff to identify a robust causal connection between the challenged policy and the disparate impact on the protected class. *See id.* at 541. Indeed, a "plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Id.* at 543. If the plaintiff identifies such a causal connection, the burden shifts to the defendant to show that there is a "valid interest served by their policies." *See id.* at 541. And if the defendant carries that burden, the plaintiff must then show that the defendant's valid interest "could be served by another practice that has a less discriminatory effect." *See id.* at 527 (quoting 24 C.F.R. § 100.500(c)(3)); *see also Reyes v. Waples Mobile Home Park L.P.*, 903 F.3d 415, 424 (4th Cir. 2018).

Following *Griggs*, numerous federal courts have found discrimination in cases where two meaningfully different groups are treated the same, thus producing a disparate impact. *See, e.g.*, *Dothard v. Rawlinson*, 433 U.S. 321, 331-32, 336 (1977) (recognizing that height and weight requirements for prison guards produced a disparate impact on the basis of sex but ultimately finding that the discrimination was a bona fide occupational qualification); *Easterling v. Connecticut*, 783 F. Supp. 2d 323, 335-36, 344 (D. Conn. 2011) (holding that a 1.5 mile run requirement for prison guards has a disparate impact on women and finding no legitimate interest served by the requirement); *Greenspan v. Auto. Club of Mich.*, 495 F. Supp. 1021, 1034-35 (E.D. Mich. 1980) ("Testimony established that one of the job requirements for assistant branch manager . . . was prior experience in claims, which, until recently, had been a predominantly male field. As a result, no women were

24

eligible for the assistant manager's position because of their historic inability to obtain the requisite claims background."). Courts have also applied disparate impact analysis to claims of discrimination based on disability;[19] status as a religious, linguistic, or ethnic minority;[20] and naturalized citizenship status,[21] among others.

We find the Supreme Court's analysis concerning the application of the disparate impact theory of liability to the FHA applicable to § 20-705. Of course, the FHA does not include source of income as a prohibited factor. But whether the disparate impact theory applies depends on whether the operative language of the statute reaches the effect of conduct, not on the list of prohibited factors. *See Inclusive Communities*, 576 U.S. at 534-36. Here, § 20-705(1), like the analogous provision of the FHA, forbids a person to "otherwise make unavailable or deny" housing on the protected bases. As the Supreme Court found in *Inclusive Communities*, that is "results-oriented language" supporting disparate impact analysis. 576 U.S. at 534. And § 20-750(2) makes it unlawful to

---

[19] *Payan v. L.A. Community Coll. Dist.*, 11 F.4th 729, 739 (9th Cir. 2021) (finding that the school's web portal was a facially neutral practice that has a disparate impact on blind students because it was not compatible with screen reading software, thus precluding blind students from using it to access grades or register for classes).

[20] *Reyes*, 903 F.3d at 421, 428-29 (finding that plaintiffs had made a prima facie case that a policy requiring a document proving legal status to live in a mobile home park disparately impacted Hispanic and Latino families in violation of the FHA).

[21] *Mi Familia Vota v. Fontes*, 129 F.4th 691, 714 (9th Cir. 2025) ("Although the Voting Laws are written as if they confirm the citizenship status of all voters, running a citizenship check . . . requires an immigration number. As a result, county recorders can only conduct . . . checks on naturalized citizens and non-citizens." (citation omitted)).

25

"discriminate" on protected bases, using language equally as broad as that in the analogous provision of the FHA.

And just as the Supreme Court noted the significance of Congress staying silent in the face of many courts' interpretations of that language to authorize disparate impact claims, 576 U.S. at 536, the Maryland General Assembly has not altered the analogous language of § 20-705 in the face of those same rulings or the decision in *Inclusive Communities* applying disparate impact analysis to identical provisions in the FHA. Indeed, the General Assembly added "source of income" to § 20-705, without any change to the operative language, just five years after the Supreme Court decided *Inclusive Communities*. And, like the anti-discrimination provisions in the FHA, § 20-705 was enacted "to eradicate discriminatory practices within a sector of [the] economy." *Cf. Inclusive Communities*, 576 U.S. at 539. Indeed, emphasizing that the statutes are intended to work in tandem, when the General Assembly originally enacted § 20-705, it identified its general purpose as "prohibiting discriminatory housing practices in a manner substantially equivalent or similar to the" FHA. 1991 Md. Laws, Ch. 571. Recognizing disparate impact liability is consistent with that purpose. However, in applying that framework, we also recognize the importance of the limitations on disparate impact analysis discussed in *Inclusive Communities*, including that it is intended to preclude only

26

"artificial, arbitrary, and unnecessary barriers," not policies that are "necessary to achieve a valid interest[.]"[22] *Inclusive Communities*, 576 U.S. at 540-41.

As we have observed, Ms. Hare's operative complaint includes the language of a disparate impact claim. She argues that DSB's minimum-income requirement "disproportionately impacts and discriminates against individuals who . . . have income made up of [housing choice vouchers] and [supplemental security income]"; that it "would have a discriminatory impact on individuals whose source of income is made up of [housing choice vouchers]"; and that the requirement "virtually eliminates the possibility for a [housing choice voucher] recipient to ever be able to rent" apartments in the complex at issue. And although she failed to press the disparate impact theory in summary judgment briefing, she has done so on appeal, and DSB has waived any objection on preservation grounds.[23]

---

[22] In recognizing the persuasiveness of the Court's analysis in *Inclusive Communities*, we of course express no opinion on any particular application of that analysis by other courts.

[23] A party's lack of preservation regularly causes this Court not to take cases and not to decide unpreserved issues in cases we take. *See, e.g.*, *Cromartie v. State*, 490 Md. 297, 300-01, 309-11 (2025) (declining to resolve a question that the petitioner had not preserved); *Allmond v. Dep't of Health & Mental Hygiene*, 448 Md. 592, 606 (2016) (recognizing that, while the Court has discretion to look past preservation issues, "[o]rdinarily, we do not exercise this discretion, because it is best to allow a 'proper record [to] be made with respect to the challenge' and 'the other parties and the trial judge [to be] given an opportunity to consider and respond to the challenge'" (second and third alterations in original) (quoting *Chaney v. State*, 397 Md. 460, 468 (2007))).

But lack of preservation is an issue that can be waived. *See, e.g.*, *Cunningham ex rel. Gaines v. Baltimore County*, 487 Md. 282, 316 n.21 (2024) (stating that the petitioner "has waived any argument that the Defendants waived or failed to preserve their argument concerning qualified immunity"). And like other issues that can be waived, when it is

27

We hold that disparate impact is an appropriate framework to apply to Ms. Hare's claim. Applying that framework, the relevant question is not whether Ms. Hare was treated the same as others with different sources of income, but whether the application of the minimum-income requirement, even though facially neutral, results in a discriminatory impact against holders of housing choice vouchers. With the disparate impact theory of liability in the case, DSB was thus not entitled to summary judgment solely on the ground that it treated all sources of income identically.

DSB also contends that the circuit court properly awarded it summary judgment based on State Government § 20-704(d), which, in relevant part, clarifies that the prohibition against source-of-income discrimination does not "prohibit a person from determining the ability of a potential buyer or renter to pay a purchase price or pay rent by verifying in a commercially reasonable and nondiscriminatory manner the source and

_____

waived, it is not a barrier to the Court addressing the issue that was not preserved. *See, e.g.*, *id.*; *Madrid v. State*, 474 Md. 273, 322 (2021) ("[W]e decline the State's invitation to refuse to consider certain of [petitioner's] contentions on the ground of lack of preservation for appellate review. . . . [T]he State neither cross-petitioned for a writ of *certiorari* nor raised in the Court of Special Appeals the issues as to lack of preservation that the State raises before us."); *Baltimore County v. Quinlan*, 466 Md. 1, 15-16 (2019) (declining to "decide this preservation issue" because the respondent "failed to raise this preservation issue"); *Rosales*, 463 Md. at 568 (concluding that the Court could "consider the basis for review of [petitioner's] belated appeal" based on the respondent's waiver of objection to the untimeliness of the petitioner's notice of appeal, as well as the determination that that issue was subject to waiver); *State v. Williams*, 392 Md. 194, 227 n.11 (2006) (declining to hold that the State waived an argument because "certiorari was properly granted on the issue" and the respondent waived the issue by failing to argue waiver in a cross-petition).

To be sure, this is not the usual way issues should come before this Court. But DSB's decision not to raise preservation in this Court combined with the parties' respective briefing concerning disparate impact has placed the issue squarely before us.

amount of income or creditworthiness of the potential buyer or renter[.]" State Gov't § 20-704(d)(1). DSB argues that this provision authorizes it and other landlords to impose minimum-income requirements. Perhaps so, depending on the requirement and how it is applied. But the first touchstone for application of this provision is whether the practice at issue truly "determin[es] the ability of a potential buyer or renter to pay a purchase price or pay rent[.]" State Gov't § 20-704(d)(1). When a voucher subsidy leaves a tenant obligated to pay only a portion of total rent, there is reason to doubt whether a minimum-income requirement applied to the full rent obligation bears any relationship to ability to pay. *Cf. Griggs*, 401 U.S. at 432 (holding that a provision in Title VII permitting the use of assessments in hiring applied only to assessments that were relevant to the jobs at issue, and so did not support the use of an assessment in that case). On this record, § 20-704(d)(1) does not support an award of summary judgment in favor of DSB as a matter of law.

For those reasons, we will vacate the judgment of the circuit court and remand for further proceedings consistent with this opinion. It will be appropriate for the circuit court to address on remand the application of disparate impact analysis to Ms. Hare's claim in the first instance.[24]

---

[24] As both parties acknowledge, other jurisdictions that have confronted this issue in connection with their own source-of-income discrimination provisions have universally adopted approaches similar to that proposed by Ms. Hare, requiring minimum-income requirements to be applied to a voucher-holding tenant's share of the rent, not overall rent. A couple of those jurisdictions, including Washington, have done so expressly by statute and others have done so through regulatory guidance or case law. *See, e.g.*, *Comm'n on Hum. Rts. & Opportunities v. Sullivan Assocs.*, 739 A.2d 238, 254 (Conn. 1999) (holding that a showing of "insufficient income" should relate to "the potential tenant's own ability to meet his or her personal rent obligation for that part of the rental not covered by section

29

**CONCLUSION**

Ms. Hare has made a disparate impact claim. Whether DSB counted her voucher income in the same way it counts other sources of income is thus not dispositive of whether DSB is entitled to judgment as a matter of law. Accordingly, we will vacate the judgment of the circuit court and remand for proceedings consistent with this opinion.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED; COSTS TO BE PAID BY APPELLEE.**

---

8 rental assistance payments"); *Moran v. Tower Mgmt. Servs., L.P.*, No. HB52WR-61415, at *4 (N.J. Div. on Civ. Rts. June 18, 2019), https://www.nj.gov/oag/newsreleases20/Tower.FPC.pdf [https://perma.cc/5Z39-BP4G] (finding probable cause to support complainant's claim of discrimination based on source of lawful income and explaining that respondent had "not demonstrated that its minimum income requirement of $33,000 per year for a one bedroom apartment serves a legitimate non-discriminatory business interest as applied to applicants with Section 8 housing vouchers, where the applicant only pays a small portion of the monthly rent"); Wash. Rev. Code § 59.18.255(h)(3) (in source-of-income discrimination provision, stating: "If a landlord requires that a prospective tenant or current tenant have a certain threshold level of income, any source of income in the form of a rent voucher or subsidy must be subtracted from the total of the monthly rent prior to calculating if the income criteria have been met"); N.Y. Div. of Hum. Rts., Guidance on Protections from Source of Income Discrimination in Housing Under the New York State Human Rights Law 1, 5 (2020), https://dhr.ny.gov/system/files/documents/2022/05/nysdhr-soi-guidance-2020.pdf [https://perma.cc/39BZ-V2UX] ("A housing provider cannot have a facially neutral income or wealth requirement that is equally applied but has the effect of excluding populations with rental subsidies."); Va. Real Estate Bd., Guidance Document: Housing Discrimination on the Basis of Source of Funds 4 (2021), https://townhall.virginia.gov/L/GetFile.cfm?File=C:\TownHall\docroot\GuidanceDocs\222\GDoc_DPOR_6978_v1.pdf [https://perma.cc/2N6J-MK4L] (saying that "[h]ousing providers should be careful to ensure this otherwise neutral criteria is not applied in a manner that results in the automatic disqualification of HCV holders who, by definition, have a portion of their rent paid by a third party[,]" while also noting that in order to "determine if a tenant can afford the rent, the relevant factor for a landlord's risk assessment is the *tenant's portion* of rent, not the total rent").

IN THE SUPREME COURT

OF MARYLAND

No. 32

September Term, 2024

_____

KATRINA HARE

v.

DAVID S. BROWN ENTERPRISES, LTD.

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough

JJ.

_____

Concurring Opinion by Watts, J.

_____

Filed: July 28, 2025

Respectfully, I concur. I agree with the Majority's holding that Katrina Hare, Appellant, has made a disparate impact discrimination claim. As such, I join Part III of the majority opinion, titled "Disparate Impact," and the conclusion section of the opinion, vacating the judgment of the circuit court and remanding the case for proceedings consistent with the majority opinion. See Maj. Slip Op. at 20-30. Applying the different burden-shifting frameworks that apply to disparate treatment and disparate impact discrimination claims in the housing discrimination context, however, I would hold that Ms. Hare may proceed under both theories, as she has demonstrated that David S. Brown Enterprises, Ltd.'s ("DSB"), Appellee's, income verification policy both disparately treats and impacts voucher holders in a discriminatory manner, contrary to the plain language and purpose of the Housing Opportunities Made Equal Act (the "HOME Act").

In 2020, the Maryland General Assembly passed the HOME Act, which expanded the State's housing policy to prohibit discrimination based on an individual's source of income. See 2020 Md. Laws, Ch. 117. The relevant statute now provides that a landlord may not refuse to rent, refuse to negotiate for the rental of, or otherwise make unavailable or deny a dwelling to any person because of their source of income, among other protected classes. See Md. Code Ann., State Gov't ("SG") § 20-705(1). One source of income a landlord may not discriminate against a renter for using is a Housing Choice Voucher ("HCV"), a voucher issued by state public housing agencies under a federally backed program that is designed to assist low-income renters in qualifying for housing and affording their monthly rent. See 42 U.S.C. § 14379f. Under the HOME Act, a landlord must determine the ability of an applicant to pay rent "by verifying in a commercially

reasonable and nondiscriminatory manner the source and amount of income or creditworthiness of the potential" renter. SG § 20-704(d)(1).

Ms. Hare applied to rent an apartment from DSB. Ms. Hare's application was denied on the basis that she did not meet DSB's requirement that an applicant demonstrate monthly income totaling 2.5 times the monthly rent of the unit. Ms. Hare is a voucher holder. She receives $841 per month in supplemental security income ("SSI"), and she received a voucher that would cover $1,464 of the anticipated $1,590 rent each month; this is the monthly cost of the unit Ms. Hare applied to rent from DSB. After use of the voucher, Ms. Hare would have been required to pay only $126 in rent herself. Under DSB's policy, Ms. Hare demonstrated that her monthly income totaled $2,305 ($841 + $1,464). The required income threshold under DSB's policy mandated that Ms. Hare demonstrate income totaling $3,975 ($1,590 x 2.5). In the Circuit Court for Baltimore County, Ms. Hare brought discrimination claims against DSB, alleging disability discrimination and source of income discrimination under the HOME Act.

DSB moved for summary judgement, which the circuit court granted. The circuit court concluded that Ms. Hare's denial was entirely related to ineligibility due to her financial means, and unrelated to her disability or source of income. The circuit court reasoned that DSB had not discriminated against Ms. Hare, but that she was properly denied under DSB's policy that considered her income from the HCV. The circuit court found that the HOME Act prohibits discrimination only on the basis of income source, not income calculation methodology, and therefore DSB's methodology in calculating Ms. Hare's income was not discriminatory. Ms. Hare appealed.

After filing a notice of appeal, Ms. Hare filed a bypass petition of *certiorari* to this Court, which we granted. Before this Court, Ms. Hare contends, under discrimination theories of disparate treatment and disparate impact, that DSB's policy requiring applicants to demonstrate monthly income totaling 2.5 times the monthly rental cost of a unit, rather than monthly income totaling 2.5 times the applicant's share of the rent, is source of income discrimination under the HOME Act. DSB responds, however, that Ms. Hare has not been subjected to disparate treatment because the HOME Act does not require landlords to use a certain methodology for determining an applicant's ability to afford the monthly rental price of a unit. DSB also contends that Ms. Hare is not disparately impacted by its policy, as any person with Ms. Hare's income would be deemed financially unqualified for the rental unit.

I would hold that Ms. Hare has demonstrated a *prima facie* case of source of income discrimination under both disparate treatment and disparate impact theories of discrimination as a voucher holder under DSB's policy and that DSB is unable to demonstrate a legitimate, nondiscriminatory reason for the denial of her application or that the challenged policy is necessary to achieve a substantial, legitimate, nondiscriminatory interest. I would reverse the circuit court's grant of summary judgment to DSB and remand the case to the circuit court for further proceedings, *i.e.*, trial.

**Factual Background and Procedural History**

On February 5, 2022, Ms. Hare applied to rent an apartment in the St. Charles at Olde Court Apartments ("St. Charles"), owned by DSB. At that time, Ms. Hare lived in a two-story home that required her to go up and down stairs to enter and leave her home and

to perform other daily activities. Ms. Hare is disabled due to severe osteoarthritis, which makes, among other daily activities, climbing stairs extremely difficult. Ms. Hare applied for a main level unit at the St. Charles, seeking to alleviate the issues with the stairs in her then-current home. The market rent for the St. Charles unit that Ms. Hare applied for was $1,590 per month.

Ms. Hare qualified for and received an HCV through the HCV Program of the Baltimore County Office of Housing, a federally backed voucher program.[1] In Ms. Hare's application, she listed her monthly income as $841, reflecting the SSI she received each month. On February 10, 2022, Ms. Hare's application to rent a unit from DSB was conditionally approved, and she was informed of the outcome by letter. The letter also stated, however, that the application was not fully approved due to insufficient income and Ms. Hare was required to meet additional financial requirements as a condition of the approval.

According to Ms. Hare, on February 10, 2022, DSB learned that the source of her income would come, in part, from an HCV. The same day, Ms. Hare learned that her application had been cancelled online. Ms. Hare asserts that when she inquired as to the

---

[1]Federal law provides for low-income housing assistance. See 42 U.S.C. § 1437f. The Secretary of the Department of Housing and Urban Development ("HUD") is authorized to enter into contracts with state public housing agencies to make "assistance payments" to landlords. 42 U.S.C. § 1437f(b)(1). 42 U.S.C. § 1437f(o) establishes the voucher program and the requirements of the program. Essentially, the program provides a voucher to a family or individual who earns an income under a specified limit, which will cover rent exceeding, typically, 30 percent of the voucher holder's monthly adjusted income. See § 1437f(o)(2). In other words, if all qualifications are met, a voucher holder pays 30 percent of their monthly adjusted income in rent, and the voucher pays the landlord the remaining amount.

- 4 -

status of her application, a DSB property manager informed her that her application had been cancelled because she did not provide her a copy of her license or proof of income. Ms. Hare informed the property manager that both a copy of her license and proof of income had been submitted via email, which the property manager then located. Ms. Hare's application was reinstated.

Ms. Hare alleged that thereafter DSB failed to take action on her application, resulting in it being automatically cancelled and her voucher expiring. Ms. Hare secured an extension on her voucher and DSB reinstated her application again, but DSB failed to complete paperwork required by the Baltimore County Department of Housing and Community Development ("DHCD"). Ms. Hare elevated the issue to the property manager and assistant manager, at which point DSB did submit the paperwork, but the application was cancelled for a third time when the rent was said to be higher than the DHCD payment standard.[2] Ms. Hare secured an increased payment standard percentage and on April 13, 2022, DSB was informed by DHCD that the payment from the voucher, in addition to Ms. Hare's portion, would cover the entire rent amount. On the same day, Ms. Hare's application was reinstated and DSB scheduled an inspection with DHCD. Subsequently, a DHCD employee emailed DSB, indicating that Ms. Hare's housing voucher would cover $1,464 per month and Ms. Hare would be responsible for paying the remaining $126 per

---

[2]Under 42 U.S.C. § 1437f(o)(1)(A), a payment standard is used to determine the monthly assistance that may be paid to a voucher holder. By law, a payment standard may not exceed 110 percent, nor be less than 90 percent, of the fair market rental for the same size of dwelling unit in the same market area. 42 U.S.C. § 1437f(o)(1)(B). However, as a reasonable accommodation for a person with a disability, the payment standard may be increased to not more than 120 percent of the fair market rent. 42 U.S.C. § 1437f(o)(1)(D).

month.

On April 14, 2022, Ms. Hare received a phone call from a DSB leasing agent, informing her that her application was being denied.  The call was transferred to the St. Charles property manager, who explained that the denial was based on the DSB policy that required a renter's income to be at least 2.5 times the rent amount.  The property manager at St. Charles stated that in order for Ms. Hare to qualify to rent the unit, she would have needed to show income of $3,975, which is 2.5 times the monthly rent of $1,590 per month.  Even considering the $1,464 from the HCV, combined with Ms. Hare's $841 from SSI, Ms. Hare's total income was $2,305, which did not meet the 2.5 times the rent requirement.

DSB's policy allows an applicant to meet its 2.5 times income criteria by combining income from different sources.  The policy lists acceptable forms of income including: certain tax return documents, paystubs, court ordered child support or alimony forms, SSI benefits, unemployment, pensions, or vouchers.  Unlike with voucher holders, however, the policy allows for full-time students to qualify without meeting the 2.5 times the rent income requirement by using either a guarantor or "an I-20 Form or other official government documentation indicating that, through some form of financial aid, the applicant's living expenses will be provided."

Ms. Hare brought suit against DSB on October 17, 2022, in the Circuit Court for Baltimore County, alleging disability discrimination and source of income discrimination under the Maryland HOME Act.  On January 4, 2024, DSB filed a motion for summary judgment, which the circuit court granted on April 17, 2024.  In granting the motion, the circuit court found that Ms. Hare's denial was entirely related to her financial means,

unrelated to her disability, and thus, she was not discriminated against based on her disability. The circuit court also found that Ms. Hare had not been discriminated against for her use of the HCV, as DSB had accepted Ms. Hare's HCV as income and calculated her ability to meet their income qualification requirements with the amount from the HCV included.

The circuit court looked to other states' statutory prohibitions on source of income discrimination. In Washington, California, and Virginia, statutes and regulations proscribe an income methodology for assessing a renter's income against a landlord's income criteria. The circuit court stated that in Washington, for example, income from a rent voucher must be subtracted from the total monthly rent prior to calculating whether the income criteria has been met. The circuit court concluded that the HOME Act, on the other hand, only prohibits discrimination on the basis of income source, not income methodology, as it does not contain similar statutory or regulatory provisions as those in Washington, California, or Virginia.

Ms. Hare appealed to the Appellate Court of Maryland on May 10, 2024.

On August 27, 2024, Ms. Hare filed a bypass petition for a writ of *certiorari*, raising the following issue:

> Where a tenant's rent is subsidized by a housing voucher, does a landlord's imposition of an income requirement that ignores the share of rent guaranteed by the voucher and has the effect of excluding voucher holders constitute source-of-income discrimination in violation of Md. Code Ann., State Government § 20-705?

On November 22, 2024, we granted the petition. See Hare v. David S. Brown Enter., Ltd., 489 Md. 243, 327 A.3d 110 (2024).

## Standard of Review

This Court reviews a circuit court's grant of summary judgment without deference. See Lithko Cont., LLC v. XL Ins. America, Inc., 487 Md. 385, 400, 318 A.3d 1221, 1229 (2024) (citing Bd. of Cnty. Comm'rs of St. Mary's Cnty. v. Aiken, 483 Md. 590, 616, 296 A.3d 933, 948 (2023)).  "In doing so, we come to an independent determination of whether, reviewing the record in the light most favorable to the nonmoving party and construing all reasonable inferences against the moving party, a genuine dispute of material fact exists and whether the moving party is entitled to judgment as a matter of law."  Id. at 400, 318 A.3d at 1229.

## The Maryland HOME Act

"It is the policy of the State to provide for fair housing throughout the State to all, regardless of race, color, religion, sex, familial status, national origin, marital status, sexual orientation, gender identity, disability, source of income, or military status[.]"  SG § 20-702(a)(1).  It is also the policy of the State "to prohibit discriminatory practices with respect to residential housing by any person, in order to protect and ensure the peace, health, safety, prosperity, and general welfare of all."  SG § 20-702(a)(2).

SG § 20-705(1) provides that a person may not

> refuse to sell or rent after the making of a bona fide offer, refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, disability, marital status, familial status, sexual orientation, gender identity, national origin, source of income, or military status[.]

Source of income is defined as "any lawful source of money paid directly or indirectly to or on behalf of a renter or buyer of housing."  SG § 20-701(j)(1).  Source of

income includes income from:

(i) a lawful profession, occupation, or job;

(ii) any government or private assistance, grant, loan, or rental assistance program, including low-income housing assistance certificates and vouchers issued under the United States Housing Act of 1937;

(iii) a gift, an inheritance, a pension, an annuity, alimony, child support, or any other consideration or benefit; or

(iv) the sale or pledge of property or an interest in property.

SG § 20-701(j)(2).

The prohibition against discrimination based on an individual's income source does not prohibit a person from determining the ability of a potential renter to pay rent "by verifying in a commercially reasonable and nondiscriminatory manner the source and amount of income or creditworthiness of the potential" renter.  SG § 20-704(d)(1).

**Housing Discrimination**

Housing discrimination claims usually fall under two theories: disparate treatment, in which a plaintiff alleges intentional discrimination, or disparate impact, in which a plaintiff alleges that the defendant's facially neutral practice disparately impacts a protected class.  See Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly, 658 F.3d 375, 381 (3d Cir. 2011).

Though this Court has not addressed either theory in the housing income discrimination context, we have discussed both in cases involving employment discrimination and discriminatory juror strikes.  See Edmonds v. State, 372 Md. 314, 330, 812 A.2d 1034, 1043 (2002); Molesworth v. Brandon, 341 Md. 621, 638, 672 A.2d 608,

616-17 (1996). In the equal employment context, we have sanctioned consulting federal precedent in the absence of our own jurisprudence on the issue. See Taylor v. Giant of Md., LLC, 423 Md. 628, 653, 33 A.3d 445, 460 (2011). Given that we have not addressed an income discrimination issue under the HOME Act, the question becomes what test is applicable. Reviewing federal precedent reveals that disparate impact and disparate treatment (intentional discrimination claims) are cognizable in the housing discrimination context and that separate tests apply.

## Disparate Treatment

To state a claim for disparate treatment, a plaintiff must allege receiving different treatment than a similarly situated individual or group on the basis of their membership in a protected class. See Moody v. Related Cos., L.P., 620 F.Supp.3d 51, 55 (S.D.N.Y 2022) (discussing claims under the federal Fair Housing Act). "[A]t the summary judgment stage, the plaintiff must produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant and the defendant's actions adversely affected the plaintiff in some way." Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist., 17 F.4th 950, 972 (9th Cir. 2021) (cleaned up). "A plaintiff may establish [] discrimination through direct evidence or circumstantial evidence." Town of Riverdale Park v. Ashkar, 474 Md. 581, 615, 255 A.3d 140, 160 (2021) (citations omitted). Circumstantial evidence, especially in discrimination cases, "is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) (cleaned up). The "ultimate question" is whether the plaintiff was the "victim of intentional discrimination."

Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 295 (4th Cir. 2010) (cleaned up). "Proof of discriminatory motive is crucial to a disparate treatment claim." Gamble v. City of Escondido, 104 F.3d 300, 305 (9th Cir. 1997) (cleaned up).

When an individual "seeks to prove discrimination without the benefit of direct evidence, the [plaintiff] must first make out a prima facie case of discrimination." Molesworth, 341 Md. at 638, 672 A.2d at 617 (citing McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973)). "The elements of the prima facie case depend upon the facts of the case." Id. at 638, 672 A.2d at 617 (citation omitted). The burden of production is minimal. See Ashkar, 474 Md. at 616, 255 A.3d at 160. The United States Court of Appeals for the Second Circuit has stated that, "[t]o make out a *prima facie* discriminatory housing refusal case, a plaintiff must show that [the plaintiff] is a member of a statutorily protected class who applied for and was qualified to rent or purchase housing and was rejected although the housing remained available." Soules v. U.S. Dep't of Hous. & Urb. Dev., 967 F.2d 817, 822 (2d Cir. 1992) (citation omitted).

If the plaintiff succeeds in proving the *prima facie* case, "[t]he burden then shifts to the [defendant] to articulate some legitimate, nondiscriminatory reason for the [plaintiff]'s rejection." Molesworth, 341 Md. at 638, 672 A.2d at 617 (cleaned up). "Finally, 'the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Id. at 638-39, 672 A.2d at 617 (quoting Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981)). This burden-shifting framework was originally announced by the Supreme Court of the United States in McDonnell Douglas.

In McDonnell Douglass, 411 U.S. at 800, 802, the Supreme Court held, in a private, non-class action complaint under Title VII alleging racial employment discrimination, that the complainant has the burden of establishing a *prima facie* case, which can be satisfied by showing that (i) the complainant belongs to a racial minority; (ii) the complainant applied and was qualified for a job the employer was trying to fill; (iii) though qualified, the complainant was rejected; and (iv) thereafter, the employer continued to seek applicants with the complainant's qualifications. Recently, in Ames v. Ohio Dep't of Youth Servs., 605 U.S. ___, ___, 145 S. Ct. 1540, 1545 (2025), the Supreme Court explained:

> In *McDonnell Douglas*, this Court laid out a three-step burden-shifting framework for evaluating claims arising under that provision. 411 U. S. at 802-804, 93 S. Ct. 1817. The *McDonnell Douglas* framework aims to "bring the litigants and the court expeditiously and fairly to th[e] ultimate question" in a disparate-treatment case— namely, whether "the defendant intentionally discriminated against the plaintiff." *Burdine*, 450 U. S. at 253, 101 S. Ct. 1089.
>
> At the first step of the familiar three-step inquiry, the plaintiff bears the "initial burden" of "establishing a prima facie case" by producing enough evidence to support an inference of discriminatory motive. *McDonnell Douglas*, 411 U. S. at 802, 9 S. Ct. 1817. If the plaintiff clears that hurdle, the burden then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Ibid*. Finally, if the employer articulates such a justification, the plaintiff must then have a "fair opportunity" to show that the stated justification "was in fact pretext" for discrimination. *Id.*, at 804, 93 S. Ct. 1817. A plaintiff "may succeed [under the *McDonnell Douglas* framework] either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U. S. at 256, 101 S. Ct. 1089.
>
> For most plaintiffs, the first step of the *McDonnell Douglas* framework—the prima facie burden—is "not onerous." *Burdine*, 450 U. S. at 253, 101 S. Ct. 1089. A plaintiff may satisfy it simply by presenting evidence "that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Ibid*.

- 12 -

(Alterations in original) (footnote omitted).

At the second step, a rejection of the defendant's proffered reasons permits the trier of fact to infer intentional discrimination, though it does not compel it. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). In Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266-67 (1977), the Supreme Court of the United States set forth non-exclusive factors that may be used to determine whether a defendant's action had an "invidious discriminatory purpose[.]" Those factors include: "[t]he historical background of the decision[,]" "[t]he specific sequence of events leading up to the challenged decision[,]" "[d]epartures from the normal procedural sequence[,]" "[s]ubstantive departures . . ., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached[,]" and "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." Id. at 266-68. In essence, "[d]iscriminatory intent may be inferred from the totality of the circumstances." Rivera v. Inc. Vill. of Farmingdale, 784 F.Supp.2d 133, 147 (E.D.N.Y. 2011) (cleaned up). This determination is "sensitive and difficult" as there is seldom eyewitness testimony as to the defendant's intent or mental processes, necessitating the use of inferences and circumstantial evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000). However, the plaintiff, at all times, carries the burden of persuasion. See id. at 143.

Discriminatory intent can be satisfied by showing the plaintiff's membership in a protected class caused the adverse action. For example, in Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977), the Supreme Court of the United States stated

- 13 -

that "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere facts of differences in treatment." (Citation omitted). See also Thomas v. Eastman Kodak Co., 183 F.3d 38, 64 (1st Cir. 1999) (holding that a plaintiff can meet the burden of proving discriminatory animus without "smoking gun" evidence when disparity of treatment is "striking enough" to infer the plaintiff's membership in a protected class was the cause of adverse action). The First Circuit in Eastman Kodak, 183 F.3d at 61, stated that at the summary judgment stage, courts should be cautious in finding non-discriminatory reasons for apparently disparate treatment, explaining that,

> [a]lthough the presumption of discrimination has dropped out of the case by the third stage of the *McDonnell Douglas*/*Burdine* framework, its rationale remains relevant: discrimination, rarely explicit and thus rarely the subject of direct evidence, may be proven through the elimination of other plausible non-discriminatory reasons until the most plausible reason remaining is discrimination.

(Citation omitted).

## Disparate Impact

"To establish a prima facie disparate impact case, a plaintiff must establish at least that the defendant's actions had a discriminatory effect." Gamble, 104 F.3d at 306 (cleaned up). "Under the disparate impact theory, a plaintiff must prove actual discriminatory effect, and cannot rely on inference." Id. (cleaned up). Similarly, "in disparate-impact cases, effect, not motivation, is the touchstone because a thoughtless housing practice can be as unfair to minority rights as a willful scheme." Reyes v. Waples Mobile Home Park Ltd. P'ship, 903 F.3d 415, 430 (4th Cir. 2018) (cleaned up).

In 2013, the Department of Housing and Urban Development ("HUD") published a

final rule titled "Implementation of the Fair Housing Act's Discriminatory Effects Standard." See 78 Fed. Reg. 11460-01 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.500 (2013)). The rule set forth the disparate impact (or effect) burden-shifting test. See 24 C.F.R. § 100.500(c). To prove a disparate impact, the charging party "has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1). Once the charging party has met its burden, the respondent "has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests[.]" 24 C.F.R. § 100.500(c)(2). If the respondent satisfies its step two burden, the charging party "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3). In 2015, the Supreme Court of the United States held that a disparate-impact theory of liability is cognizable under the federal Fair Housing Act, 42 U.S.C. § 3601 et seq. See Tx. Dep't of Hous. and Cmty. Affs. v. Inclusive Cmtys. Project, Inc., 576 U.S. 519, 545-46 (2015). The Supreme Court "implicitly adopted" HUD's disparate impact approach in Inclusive Communities. Moody, 620 F.Supp.3d at 57 n.7. This approach has been described as a "different version of the *McDonnell Douglas* burden-shifting framework than in disparate-treatment cases." Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Hum. Rel. Comm'n, 508 F.3d 366, 372 (6th Cir. 2007).

**Some Interesting Case Law on Housing Discrimination and Vouchers**

In Montgomery Cnty. v. Glenmont Hills Assoc. Priv. World at Glenmont Metro Centre, 402 Md. 250, 254, 273, 274-75, 936 A.2d 325, 327, 338, 339 (2007), a case

concerning a landlord's refusal to rent apartments to otherwise qualified applicants solely because the applicant intended to use an HCV, this Court held that an ordinance of the Montgomery County Code that prohibits landlords from refusing to rent apartments to individuals using housing vouchers was not preempted by federal law or the "spending clause." We held that in housing discrimination enforcement cases, an intent to discriminate is not required—the effect of the conduct is relevant in determining whether a landlord violated a housing discrimination law; therefore, Glenmont's policy to refuse to rent to voucher holders was a violation of the Montgomery County Code that prohibited landlords from discriminating on the basis of an individual's source of income. See id. at 278-79, 936 A.2d at 342.

In Comm'n on Hum. Rts. & Opportunities v. Sullivan Assoc., 739 A.2d 238, 251-52 (Conn. 1999), the Supreme Court of Connecticut considered whether a landlord's policy of requiring potential tenants to have a minimum weekly income equal to the amount of the total monthly rent of a unit, which resulted in no voucher holder being able to rent from the landlord, violated Connecticut's prohibition against housing discrimination on the basis of the applicant's lawful source of income. The Commission on Human Rights and Opportunities brought action to recover damages for the landlord's alleged discriminatory housing practices. See id. at 242. In two cases, the landlord denied that it had discriminated against potential renters. See id. The landlord argued that under Connecticut's discriminatory housing practices law, a landlord may lawfully deny a potential tenant based on insufficient income. See id. at 252. The Court considered the definition of "insufficient income," concluding that, in the absence of guidance from the legislature as to the phrase's

meaning, the Court was required to consider its definition in light of the need or purpose that the income serves under the statute. See id. at 253. The Court stated that the purpose the legislature likely considered in creating the exception was to ensure that a tenant had sufficient income to meet their own financial obligations to the landlord, and not to categorically exclude voucher holders. See id. at 253-54.

The Court then stated that the question remained as to whether the landlord's income policy bore a reasonable relationship to the landlord's ability to enforce a potential tenant's personal rental obligation. See id. at 254. The Court's conclusion that a landlord may not use voucher eligibility as the sole basis for denying potential tenants and the landlord could not apply a more stringent income requirement on voucher holders than other applicants. See id. at 255. As it was the first instance the Court construed the text at issue in the housing discrimination statute, the Court concluded that the landlord deserved a chance to make the case that the potential tenants were denied on the basis of insufficient income, and remanded the cases for a new trial limited to the issue of whether the potential tenants had insufficient income. Id.

## This Case

Reviewing the record in the light most favorable to Ms. Hare (as an appellate court must), applying the disparate treatment framework as described above and construing all reasonable inferences against the moving party, DSB, I would hold that Ms. Hare has satisfied the minimal burden of production necessary to demonstrate a disparate treatment claim. Like the Majority, I would, of course, also hold that Ms. Hare sufficiently demonstrated that DSB's policy has a disparate impact on voucher holders. See Maj. Slip

Op. at 27-28.[3]

## Disparate Treatment

### a. Ms. Hare can establish a *prima facie* case of discrimination.

As stated above, "[t]o make out a *prima facie* discriminatory housing refusal case, a plaintiff must show that [the plaintiff is] a member of a statutorily protected class who applied for and was qualified to rent or purchase housing and was rejected although the housing remained available." Soules, 967 F.2d at 822. Under the Supreme Court's recent holding in Ames, 605 U.S. at ___, 145 S. Ct. at 1545, in the employment context, a plaintiff must show that "she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination" In Ames, the Supreme Court explained that this showing is sufficient to support an inference of discriminatory motive, *i.e.*, intentional discrimination. See id.

Ms. Hare has demonstrated: (1) that she is a member of a statutorily protected class—voucher holders, who fall under the "source of income" protected class identified in the Home Act; and (2) that she applied to rent a unit from DSB and was rejected, though the unit remained available. In a source of income discrimination case, as compared to a housing discrimination or employment discrimination case, Ms. Hare's financial qualification to rent the unit is directly at issue due to DSB's challenged policy. In other words, it is the legitimacy of DSB's challenged policy that is dispositive of whether Ms.

---

[3]The Fourth Circuit has held that an FHA claim may proceed under either theory and the plaintiff is not required to elect which theory the claim relies upon at pre-trial, trial, or appellate stages. See Reyes, 903 F.3d at 421; see also N'tl Fair Hous. Alliance v. Bank of America, N.A., 401 F.Supp.3d 619, 631 (D. Md. 2019).

- 18 -

Hare would have been qualified to rent the unit. To determine whether Ms. Hare can establish a *prima facie* case of discrimination, *i.e.*, including that she was qualitied to rent the premises in question, requires consideration of whether Ms. Hare has presented evidence sufficient for a rational juror to conclude that DSB's policy violates the HOME Act's prohibition on discrimination based on an individual's source of income.

Ms. Hare contends that the policy discriminates against voucher holders because it requires only voucher holders to prove income far greater than 2.5 times their share of rent, whereas a non-voucher holder must only prove income of 2.5 times their share of rent. DSB, on the other hand, contends that the HOME Act does not require a landlord to calculate income requirements in the way Ms. Hare contends. In my view, it is not acceptable to simply determine that "DSB was entitled to summary judgment as a matter of law on Ms. Hare's disparate treatment theory of liability" because Ms. Hare's "argument depends on redefining the measuring sticks applied by DSB[.]" Maj. Slip Op. at 20. The validity of "measuring sticks" used by DSB is precisely what is called into question under the plain language of the HOME Act. If we accept a formula or rule established by a landlord as valid simply because it is applied to all potential renters regardless of the landlord's motive and regardless of whether the formula or rule is commercially reasonable or nondiscriminatory as required by the HOME Act, as long as a landlord's rule is deemed "facially neutral" no plaintiff will ever be successful in establishing a *prima facie* case of discrimination based on disparate treatment under the Act. This cannot have been the intent of the General Assembly.

To assess DSB's argument that the HOME Act does not require a landlord to

calculate income requirements based on the applicant's actual share of the rent, rather than the total rent, we must examine first the statutory language of the HOME Act. "[T]he chief objective of statutory construction is to discover and effectuate the actual intent of the legislature in enacting the statute." Deville v. State, 383 Md. 217, 223, 858 A.2d 484, 487 (2004) (citation omitted). "We begin with the plain language of the statute, and where the language of the statute is ambiguous, our task is to resolve that ambiguity, in light of the legislative intent, using all the resources and tools of statutory construction at our disposal." Id. at 223, 858 A.2d at 487.

The HOME Act allows a landlord to determine the ability of a potential renter to pay rent "by verifying in a commercially reasonable and nondiscriminatory manner the source and amount of income or creditworthiness of the potential" renter. SG § 20-704(d)(1). The Act does not define "commercially reasonable and nondiscriminatory manner." The Act clearly indicates, however, that the verification's purpose is to allow a landlord to determine the ability of a potential *renter to pay rent*. See SG § 20-704(d)(1). SG § 20-704(d)(1) states that the prohibitions against discrimination based on source of income do not "prohibit a person from determining the ability of a potential buyer or renter to pay a purchase price or pay rent by verifying in a commercially reasonable and nondiscriminatory manner the source and amount of income or creditworthiness of the potential buyer or renter[.]"

The plain language of the statute demonstrates that the landlord is determining the ability of a potential renter to pay rent by verifying in a commercially reasonable and nondiscriminatory manner "the source and amount of income or creditworthiness of the

- 20 -

potential buyer or renter[.]" This reading of the statute demonstrates that what the landlord is looking for is the renter's ability to pay rent by assessing "the source and amount of income of creditworthiness of the potential [] renter." Id. In doing so, the landlord is permitted to use a commercially reasonable and nondiscriminatory manner. The plain language of the statute is unambiguous in this respect.

Based on the plain language of the statute, the question becomes whether DSB's rule of requiring income in an amount of 2.5 times the rental price for voucher holders is commercially reasonable and nondiscriminatory. The answer is no. The existence of such a rule applied to voucher holders is in and of itself evidence of motive on the part of the landlord to exclude, *i.e.*, discriminate against, Ms. Hare and other voucher holders and satisfies the first part of the disparate treatment test established by the Supreme Court of the United States. Accepting such a rule as not constituting disparate treatment because, as the Majority concludes, it is allegedly applied by DSB to all potential renters, deprives voucher holders from ever being able to prove disparate treatment because a voucher holder will never be able to demonstrate that the holder was indeed qualified but not offered a unit that remained available. See Maj. Slip Op. at 20. Equally as important, the record demonstrates DSB does not apply the 2.5 times the rent income requirement to all potential renters. As will be discussed in more detail below, DSB's written policy exempts students who receive assistance from the federal government in the form of financial aid from the 2.5 times the rent income requirement. This being the case, it cannot be said without further analysis that DSB's policy does not treat voucher holders in a discriminatory manner.

Although the language of the HOME Act is clear, and analysis on the matter could

end here—*i.e.*, not applying the 2.5 rule to students who receive financial aid but applying the rule to voucher holders is circumstantial evidence that the rule is not being applied in a commercially reasonable and nondiscriminatory manner and constitutes evidence of discriminatory motive as to voucher holders—it may be prudent to examine what can be gleaned from the legislative history of the HOME Act.

In January 2020, the HOME Act was introduced as Senate Bill 530. See First Reader, S.B. 530 (January 30, 2020). The stated purpose of the HOME Act was to expand the State's housing policy to provide for fair housing to all citizens regardless of their source of income. See 2020 Md. Laws, Ch. 117. In the Act's preamble, the General Assembly identified that Anne Arundel County, Baltimore County, Frederick County, Howard County, Montgomery County, Prince George's County, the City of Annapolis, the City of Baltimore, and the City of Frederick all have laws prohibiting source of income discrimination, as well as fifteen states,[4] the District of Columbia, and more than 80 other localities across the country. See 2020 Md. Laws, Ch. 117. The preamble states that the HOME Act does not "prevent private landlords from considering relevant nondiscriminatory factors in screening rental applicants, including an applicant's ability to comply with lease terms and prior tenancy history[.]" Id.

---

[4]The identified states were: California, Connecticut, Delaware, Maine, Massachusetts, Minnesota, New Jersey, New York, North Dakota, Oklahoma, Oregon, Utah, Vermont, Washington, and Wisconsin. Since 2020, Illinois, Colorado, Hawaii, Michigan, Virginia, and Rhode Island also passed similar laws. See Poverty & Race Rsch. Action Council, Appendix B: State, Local, and Federal Laws Barring Source-of-Income Discrimination 18 (Jan. 2025), http://www.prrac.org/pdf/AppendixB.pdf [https/perma.cc/MS2U-8ZQJ].

During the Third Reading of Senate Bill 530 in the House, much of the discussion focused on the voucher program. See Testimony of Delegate Kumar P. Barve, S.B. 530, 2020 Session, Third Reading (March 10, 2020), at 2:29:39; see also, e.g., Testimony of Delegate Jason C. Buckel, S.B. 530, 2020 Session, Third Reading (March 10, 2020), at 2:00:12; Testimony of Delegate Marvin E. Holmes, S.B. 530, 2020 Session, Third Reading (March 10, 2020), at 2:04:54; Testimony of Delegate Christopher T. Adams, S.B. 530, 2020 Session, Third Reading (March 10, 2020), at 2:08:20. In addition, one proponent stated that Senate Bill 530 was intended to "put all people who can afford rent on a level playing field." See Del. Barve Testimony, at 2:29:05. Opponents to the bill raised issues of complicating bureaucracy, property rights, and recouping security deposits in the case of property damage. See Testimony of Delegate Mike Griffith, S.B. 530, 2020 Session, Third Reading (March 10, 2020), at 2:32:04; Testimony of Delegate Matthew Morgan, S.B. 530, 2020 Session, Third Reading (March 10, 2020), at 2:24:05; Del. Adams Testimony, at 2:12:10. Proponents urged that a landlord may still decline to rent to an individual under Senate Bill 530 based on their credit or past rental history; however, questions regarding an income threshold, such as the one found here, were not explicitly raised or discussed.

The General Assembly clearly expressed its intent, through the HOME Act, to place voucher holders in particular on a level playing field with renters without vouchers. As stated in the bill's Fiscal and Policy Note, "the income derived from government housing assistance (*i.e.*, housing vouchers) tends to be the most controversial." S.B. 530, 2020 Leg., Reg. Sess. (Md. 2020), Revised Fiscal and Policy Note, at 5 ("Fiscal and Policy

Note"). The Fiscal and Policy Note recognized that some other states' statutes include the use of housing vouchers in their source of income protections, while others do not. See id. For Maryland's part, the HOME Act specifically identifies low-income housing vouchers as a source of income. See SG § 20-701(j)(2)(ii).

Based on the discussions regarding Senate Bill 530, it is clear that the General Assembly intended that the exception in allowing landlords, in a "commercially reasonable and nondiscriminatory manner," to ensure a tenant's suitability to rent from a landlord includes a landlord's ability to deny an applicant based on a credit score and rental history. Non-voucher holders and voucher holders alike may have an insufficient credit score or a less-than-perfect rental history, therefore, according to the General Assembly, it is not commercially unreasonable or discriminatory for a landlord to disqualify an applicant based on those factors.

DSB's policy requiring a voucher holder to prove that they can afford 2.5 times the total rent of an apartment, however, is contrary to the purpose of SG § 20-704(d)(1) and the HOME Act as a whole. The purpose of the HOME Act is to prohibit housing discrimination for an individual's source of income and to place voucher holders on a "level playing field" with non-voucher holders. The majority of a voucher holder's rent is covered by the voucher. The voucher is paid directly to the landlord and is a guaranteed payment, as opposed to other forms of income that a renter may have, such as a salaried job where the applicant is responsible for setting aside part of the income for rent. Non-voucher holder applicants are responsible for the entirety of their rental costs, while voucher holders are only responsible for the portion not paid directly by the voucher. It

makes little sense to require both types of applicants to prove sufficient income 2.5 times the rental cost when only one type of applicant is responsible for payment of the entire rental cost. This plainly does not establish a "level playing field" for voucher holders or a "commercially reasonable or nondiscriminatory manner" of determining a voucher holder's ability to pay rent.

The legislative history of the Act supports holding that DSB's policy requiring voucher holders to demonstrate income 2.5 times the amount of a rental unit's monthly cost, rather than 2.5 times a voucher holder's portion of the rental cost, goes directly to the issue of whether a voucher holder is qualified to rent and is evidence of discriminatory motive to be considered in applying the first step of the test for discrimination based on disparate treatment.

**b. DSB is unable to proffer a legitimate, nondiscriminatory reason for Ms. Hare's rejection.**

DSB's only attempt to set forth a reason that its policy is legitimate and nondiscriminatory is DSB's assertion that its policy in requiring a prospective tenant to show 2.5 times the rental unit's monthly cost ensures "that the tenant will be financially able to afford an apartment while being able to maintain their other monthly expenses." This is plainly indefensible. As stated above, the voucher program ensures that a landlord will receive the majority of the rental payment each month directly from the government. The remaining balance of the rental payment is the responsibility of the voucher holder, which, in Ms. Hare's case, would have been $126 per month. DSB did not allege a concern over the government's payment—DSB's policy, as it stated, is intended to ensure *the tenant*

will be able to financially afford the apartment. Ms. Hare need not make assurances that the government will pay—only that she will be able to. Therefore, DSB's stated reason that Ms. Hare was denied because she could not meet the income threshold set forth in its policy is not legitimate or nondiscriminatory. The policy is entirely divorced from Ms. Hare's ability to pay the portion of the rent she was responsible for.[5]

### c. Ms. Hare can show that the reason DSB gave is pretextual due to DSB's policy regarding students.

Though DSB fails at step two, Ms. Hare is able to show that, even if accepted as a legitimate, nondiscriminatory reason, the stated reason for the policy is pretextual, namely due to DSB's nonapplication of the same income policy for students. DSB contends that the income requirement is not waived for students and that the policy allows for students to verify income coming from financial aid. But that is not how the policy reads. DSB's written policy does not state that students are also subject to the 2.5 times the rent income requirement. DSB's policy states that a full-time student may qualify using a financial aid form that shows "the applicant's living expenses will be provided." How students receive financial aid is particularly revealing in demonstrating why this policy for students who receive financial aid is evidence of intent or motive to discriminate against voucher holders.

The process by which students receive money from federal student aid loans is common knowledge. When a student resides in university or college housing, the cost of

---

[5]DSB makes a brief overture that the "higher rent price" of its units "reflect the luxury property's amenities and features" and "prospective tenants need[] to show a higher income to the meet the rent-income requirements of the unit." Ms. Hare does not argue that DSB must set its rent prices lower, and thus DSB's argument in that respect falls short.

housing is found on the university bill, along with the student's meal plan and tuition costs, and are paid for with government loans, personal funds, or private loans or grants directly to the university. When a student requests funding from a government loan for private, off-campus housing, government loans that are paid to the student's account in excess of the student's bill covering tuition, fees, and the like, are usually disbursed as a lump-sum refund to the student at the beginning of the semester, and the student is responsible for paying rent to a landlord separately. The student must exercise caution in reserving and budgeting funds throughout the entire semester in order to have funds available to pay rent. The verification DSB requires in its policy for students who receive financial aid is only capable of showing either that the student requested and accepted funds for private off campus housing or how much the student received in a lump-sum disbursement. DSB's policy makes no mention of how that sum of money is considered in accordance with its 2.5 times the rent income requirement and DSB's policy does not account for how the student will budget or what funds will be available to pay rent each month. In contrast, DSB's policy states that an applicant applying with only assets must provide six months of consecutive bank statements showing a minimum balance each month that is 2.5 times the monthly rent. No such requirement is stated for students. This, essentially, is a waiver of the 2.5 times the rent income requirement for students with financial aid in all but name or, at a minimum, a nonapplication of the income policy to such students with the same treatment not being afforded to government voucher holders.

If the purpose of the income requirement is to ensure that an applicant is able to pay rent each month and a landlord simply asks a student to prove receipt of lump sum financial

aid that provides for living expenses, it makes little sense to place a more onerous burden on a voucher holder, where the majority of the rent will be paid directly to the landlord by the government, removing the voucher holder as a middle-person responsible for managing the money.  In light of the leeway afforded students with financial aid, there is no plausible reason for the income of 2.5 times the rent income policy for voucher holders apart from a discriminatory one.  Through the elimination of other non-discriminatory reasons for the policy, the most plausible reason remaining is discrimination.[6]  See Eastman Kodak Co., 183 F.3d at 61.

## Conclusion

For the reasons stated above, I would reverse the judgment of the Circuit Court for Baltimore County and remand the case to the circuit court for trial under both disparate treatment and disparate impact theories of liability.

---

[6]According to DSB's stated purpose for its policy—ensuring that applicants are able to afford the monthly rental fee—it needed only for Ms. Hare to demonstrate that she could afford her share of the rent, $126, per month.  DSB's requirement that Ms. Hare demonstrate income 2.5 times the entire monthly rent of the unit, including the portions covered by her voucher, is entirely divorced from DSB's reason for instituting the policy, as Ms. Hare could clearly demonstrate her ability to pay her portion of the rent, the only variable DSB needed to ensure.

IN THE SUPREME COURT

OF MARYLAND

No. 32

September Term, 2024

---

KATRINA HARE

v.

DAVID S. BROWN ENTERPRISES, LTD.

---

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

---

Concurring Opinion by Gould, J.

---

Filed: July 28, 2025

I join the Court's opinion but write separately to address two matters.

## I

The first matter is the use of secondary sources in appellate opinions. Our role is to interpret and apply the law, drawing primarily on statutes, precedent, and controlling authority, and the Court has done that with its opinion in this case. But the opinion also cites secondary sources for historical context. In my view, secondary sources should supplement an analysis only when they provide *essential* context or illuminate legal principles not adequately addressed by primary authorities. In this housing discrimination case, the statutory framework and existing authorities provide sufficient foundation and historical context for the Court's reasoning. In my view, the Court's use of secondary sources for such purposes is unnecessary and risks creating the appearance that it is endorsing the journals in which they appear, all the views expressed by the authors in those papers, and the authors' analytical methods.

## II

The second matter is to emphasize what the Court is not doing in its opinion and, from my perspective, why. Both parties have presented competing positions regarding how disparate impact analysis should be conducted in this case, including what constitutes the appropriate comparator group for Ms. Hare's claim. The majority correctly declines to resolve these issues, noting that "[i]t will be appropriate for the circuit court to address on remand the application of disparate impact analysis to Ms. Hare's claim in the first instance." Maj. Op. at 29.

Although the lack of such guidance may not be satisfying to the parties, this restraint is appropriate. Complex determinations regarding disparate impact—including statistical analysis, identification of proper comparator groups, and evaluation of business justifications—are best made by trial courts in the first instance on a complete record.